IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**SHERENA TURNER,**

    **Plaintiff,**

v.                                    **CASE NO.  4:12-cv-52-RS-WCS**

**FLORIDA PREPAID COLLEGE
BOARD,**

    **Defendant.**
_____/

**ORDER**

Before me are Defendant's Motion for Summary Judgment (Doc. 47), Plaintiff's Response (Doc. 61), and Defendant's Reply (Doc. 75).

**I. STANDARD OF REVIEW**

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512 (1986). The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398

1

U.S. 144 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Thus, if reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)). However, a mere 'scintilla' of evidence supporting the nonmoving party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 251).

## II. BACKGROUND

I accept the facts in the light most favorable to Plaintiff. *See Galvez v. Bruce*, 552 F.3d 1238, 1239 (11th Cir. 2008) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1343 n.1 (11th Cir. 2002)). "'All reasonable doubts about the facts should be resolved in favor of the non-movant.'" *Id.* (quoting *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999); *Clemons v. Dougherty County*, 684 F.2d 1365, 1368-69 (11th Cir. 1982).

Plaintiff, a black female, was employed with Defendant as a Financial Analyst I from March 8, 2008, until January 18, 2011. William Thompson ("Thompson"), a white male, became her supervisor in 2008. Thompson was the direct supervisor of four employees, including Plaintiff, and the other three

employees were white. *See* Doc. 59-26, ¶ 4 & Doc. 49-1, ¶ 5. Plaintiff alleges that she was the victim of discrimination because she was subject to hostility and poor treatment by Thompson due to her race. Complaint, ¶ 16. One specific instance of alleged harassment was that Thompson called Plaintiff into his office and told her that she made him and his boss "look bad." Doc. 49-4, pg. 36;[1] Doc. 49-6; pg. 2. Another such incident was that when Plaintiff mentioned that her brother was a manager at Red Lobster, Thompson made fun of that fact. Doc. 49-4, pg. 42; Doc. 49-6, pg. 10.

 Plaintiff became frustrated with Thompson at least as early as March 23, 2009. *See* doc. 59-19. On that day, Plaintiff approached Peggy Prophet ("Prohpet"), Employee Relations Coordinator for the State Board of Administration, and told her that "she had walked out of Prepaid while her supervisor Will Thompson was talking to her" because she did not like when Thompson interrupted her to tell her things that she already knew. *Id.* Prophet sent Plaintiff back to work, but Plaintiff later returned and complained that she was stressed and overworked. *Id.* Thompson approached Prophet later that same day and expressed frustration that Plaintiff had not been available that morning, but Prophet did not inform him that Plaintiff had been "venting" to her in her office during that time. Doc. 59-23, pg. 12 & 14.

---

[1] Excerpts of Plaintiff's May 4, 2012 deposition are also contained in doc. 59-21.

Dorothy Melton ("Melton"), a black female, was the Human Resources Manager at the State Board of Administration. Doc. 49-2, ¶ 1; doc. 59-21, pg. 103. Plaintiff alleges that she spoke to Melton regarding Thompson's harassment of her at least five times, beginning in early 2010. Doc. 59-21, pg. 145. Two of these meetings were documented by Melton. In late August of 2010, Plaintiff approached Melton and claimed that she felt Thompson was treating her unfairly because Thompson made her send him an e-mail when she came to work, left for lunch, returned from lunch, and left work. Doc. 49-2, ex. 1. Melton told Plaintiff that Melton was aware that Plaintiff had been coming to work late and taking longer lunches than were permitted for over a year, and that Plaintiff's coworkers had complained about that behavior. *Id.* Melton showed Plaintiff the employee handbook which contains the designated hours for lunch, and Plaintiff left dissatisfied. *Id.*

On September 15, 2010, Melton met with both Plaintiff and Thompson. They discussed an occasion on which Plaintiff was required to do extra work because a coworker had called in sick and an earlier occasion where Plaintiff claimed that Thompson had yelled at her because of an incorrect audit. Doc. 49-2, ex. 2. At this meeting, Plaintiff acknowledged that she was making a lot of errors in her work, but blamed the errors on feeling pressured. She also told Melton that she felt that Thompson was verbally abusive and was harassing her. *Id.* Melton's

account of the meeting indicates that Thompson said that Plaintiff had "no claim to that," while Plaintiff's notes indicate that Thompson said she could not prove that she was being harassed. *Id.*; Doc. 49-6, pg. 4.[2]

The morning of November 4, 2010, Plaintiff sent an email to Thompson requesting that he stop yelling at her and being inconsiderate. Doc. 59-26, ¶ 10; doc. 59-6. That same day, Thompson completed an employee performance evaluation of Plaintiff indicating that Plaintiff's job performance had significantly diminished in 2010 and that she was deficient in many areas. Thompson placed Plaintiff on a 60-day performance improvement plan, and "if her job performance and attitude [did] not significantly improve within that time and consistently remain at this significantly improved level, then [Thompson would] recommend that [Plaintiff]'s employment with the Florida Prepaid College Board be terminated." Doc. 49-1, ex. 3.[3] Plaintiff was to be reevaluated on January 3, 2011, to determine whether she had improved her performance in the areas identified in the performance improvement plan. Doc. 59-12.

On December 15, 2010, Thompson began preparing a progress report memorandum regarding Plaintiff's performance. The memorandum indicated that Plaintiff's performance had not improved. Doc. 49-1, ex. 5.[4] The next day, Thompson finalized the memorandum and presented it to Melton, and

---

[2] Doc. 49-6 contains a copy of Plaintiff's journal entries. The same copy is contained in Doc. 59-2.
[3] This evaluation is also doc. 59-5.
[4] This memorandum is also doc. 59-20.

recommended to her that Plaintiff's employment be terminated. Melton informed Thompson that Plaintiff had requested leave pursuant to the Family Medical Leave Act ("FMLA") that day, and would not be terminated until her scheduled return on January 10, 2011. Doc. 49-1, ¶ 8. Plaintiff confirms that she requested leave from December 20, 2010, through January 7, 2011, because of a documented medical condition. *See* Doc. 49-6, pg. 27-29.[5] Plaintiff alleges that her medical condition was the result of the tremendous stress she experienced in interacting with Thompson. Doc. 59-26, ¶ 15.

While still on leave, on January 8, 2011, Plaintiff sent an email to Melton and Thomas Williams[6] informing them that Thompson had continually discriminated against her because of her race, age, religion, and exercising her right to take leave pursuant to the FMLA. Doc. 59-26, ¶ 19; Doc. 49-2, ¶ 25 & ex. 3.[7] That same day she also sent an email to Melton and Williams requesting additional leave from January 10, 2011, through January 14, 2011, to care for her mother who had been injured in a car accident in Miami. *Id.* at ¶ 20; Doc. 49-1, ex.

---

[5] These documents are identical to docs. 59-10 and 59-11.
[6] It is unclear whether Plaintiff incorrectly sent the two January 8, 2011, e-mails to Thomas Williams rather than Thomas Wallace. Each email was sent to Melton and thomas.williams@myfloridaprepaid.com, but greets Melton and "Mr. Wallace." Thomas Wallace is the Executive Director of the Florida Prepaid College Board. Doc. 49-3, ¶ 1. This may have been cleared up in Plaintiff's deposition of May 4, 2012 (Doc. 59-21, pg. 103), but only excerpts from that deposition were filed.
[7] This e-mail is also found in doc. 59-3.

7.[8] Melton did not respond to this request, but Plaintiff did receive the leave and traveled to Miami. Doc. 49-5, pg. 17-21.

On January 18, 2011, Thompson completed an employee performance evaluation of Plaintiff for the period of November 4, 2010, through January 3, 2011. Doc. 49-1, ex. 6.[9] The evaluation indicated that Plaintiff continued to submit low-quality work, refused to ask Thompson questions, communicated with Thompson in an insubordinate tone, ignored Thompson's instructions, and demonstrated a lack of initiative. *Id.* Plaintiff refused to sign this evaluation. *Id.*

January 18, 2011, was the day that Plaintiff returned to work after her leave. Upon her return, Melinda Miguel, the Inspector General of the State Board of Administration, called Plaintiff into her office to discuss the allegations of discrimination included in Plaintiff's January 8th e-mail. Later that same morning she was called into Melton's office and informed that she had two choices: resign or be terminated. Doc. 59-26, ¶ 23. Plaintiff refused to resign and was terminated. Thomas Wallace ("Wallace"), the Executive Director of the Florida Prepaid College Board, had approved Plaintiff's termination based on his discussions with Thompson. Doc. 49-3, ¶ 3.

---

[8] This e-mail is also found in doc. 59-4.
[9] This evaluation is also doc. 59-7.

### III. ANALYSIS

*Count I: Race Discrimination*[10]

Plaintiff alleges that she was the victim of racial discrimination because she was subject to hostility and poor treatment because of her race. Complaint, ¶ 16. Thompson is the only one of Defendant's employees whom Plaintiff contends treated her unfairly because of her race. Doc. 49-4, pg. 89. To establish a prima facie case of discrimination, Plaintiff must show that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job. *Burke-Fowler v. Orange County, Fla.* 447 F.3d 1319, 1323 (11th Cir. 2006). Once a plaintiff has presented evidence of discrimination, the employer must articulate a legitimate, non-discriminatory reason for its action. *Wilson v. B/E Aerospace*, 376 F.3d 1079, 1089-90 (11th Cir. 2004). If the employer meets this burden of production, the plaintiff must then establish that the proffered reason is pretextual. *Id.* at 1090.

In this case, Plaintiff presents no credible evidence that Defendant treated similarly-situated white employees differently than Plaintiff. Plaintiff contends that Thompson:

---

[10] Although Plaintiff's Complaint says that it "is an action brought under Chapter 760, Florida Statutes; 42 U.S.C. § 2000 *et. seq.* and 42 U.S.C. § 1981a," the race discrimination count is alleged only pursuant to 42 U.S.C. § 2000 *et. seq.* (Title VII), not the Florida Statutes.

8

> Harassed her, harshly criticized errors in her work in front of other employees, and was unfairly critical of her performance. He also did not punish or even comment to non-black employees when they did personal work or engaged in personal conversations or phone calls on the clock, whereas he scrutinized Plaintiff's work time and frequently told her she was wasting time.

Doc. 60, p. 7 (citing Affidavit of Sherena Turner, Doc. 59-26, ¶ 5). However, there is no evidence to substantiate these assertions. As for Plaintiff's allegations that she was singled out by having to report the times she arrived at and left work, Plaintiff claims that she asked two coworkers whether they were required to do the same: Robin Hindle ("Hindle"), who is white, and Kelia Wilkins, who is black. Neither has been asked by Thompson to record their time on a calendar. Doc. 49-4, pg. 56. However, there is no evidence that any other employees were frequently tardy or took long lunches, as Plaintiff had been doing. Doc. 49-2, ex. 1. As her comparator for how Thompson reacted to mistakes in her work, Plaintiff points to again to Hindle. Hindle is employed a management assistant and had made mistakes in a letter that she had sent out. *Id.* at 57. When Plaintiff pointed out these mistakes to Thompson "he just took the letter to her and said, 'well, next time correct it,' very politely, very nicely, and just left it alone." *Id.* Plaintiff believes that Thompson did not scold Hindle for her minor deficiencies but scolded Plaintiff for hers because she is black. *Id.* at 57-58. The record reflects numerous errors

9

made by Plaintiff throughout the course of her employment,[11] while this error by Hindle is the only one identified by Plaintiff. It cannot be said that Plaintiff and Hindle are similarly situated; not only was Hindle employed in a secretarial role and Plaintiff in a financial role, but a single mistake is not comparable to documented history of numerous errors.

Although Plaintiff has not established a comparator, the Eleventh Circuit has noted that establishing the four elements of a prima facie case of discrimination

> is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case. Rather, the plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (citing *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997)). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Smith*, 644 F.3d at 1328 (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011)).

---

[11] *See* doc. 49-1, which alleges the following errors: "Sherena submits spreadsheets with errors. Examples: FCIP Weekly Summary Report spreadsheet had multiple errors for several consecutive weeks. . . . The school invoice roster reconciliation is prepared twice a week, Sherena has submitted reconciliations with typos of school names, typos of invoice numbers, incorrect deletion amounts, and total which do not reconcile. . . . Checks submitted for deposit had a "Deposit Only" stamp in the inappropriate (bank processing use only) area. Manual Check Requests were submitted with incorrect figures and typos in the address."

No such convincing mosaic of circumstantial evidence is present in the record before me. One specific instance of harassment that Plaintiff recalled at her deposition was that Thompson had called her into his office and told her that she made him and Wallace "look bad." Doc. 49-4, pg. 36[12]; Doc. 49-6, pg. 2. Plaintiff indicated that "it wouldn't be shocking to think that [her race] could have something to do with it," because Thompson did not speak to any of her coworkers in that manner. *Id.* She also opined that that Thompson thought he could speak to her in this manner because "he wouldn't dare say that to [Wallace]," who was Thompson's boss. Plaintiff kept a journal regarding other instances that she felt constituted harassment. *Id.* at 38; Doc. 49-6. One such incident was that when Plaintiff mentioned that her brother was a manager at Red Lobster, Thompson made fun of that fact. Doc. 49-4, pg. 42; Doc. 49-6, pg. 10.

Plaintiff acknowledges that she had made no allegation that Thompson's ill treatment of her was based on her race prior to the e-mail she sent on January 8, 2011. Doc. 49-4, pg. 44. In fact, it wasn't until Plaintiff was on her FMLA leave that she even began to believe that Mr. Thompson's alleged harassment was based on her race. Doc. 60, ¶ 77 (citing doc. 59-21, pg. 83-84). Plaintiff also acknowledges that Thompson never made any comments to her about her race or anybody else's, nor did her coworkers report to her that they had heard any such

---

[12] Excerpts of Plaintiff's May 4, 2012 deposition are also contained in doc. 59-21.

comments. *Id.* at 58 & 68. There is simply no evidence, direct or circumstantial, to support Plaintiff's belief that Thompson's actions were racially motivated. Title VII is not a "civility code" that prohibits general misconduct. *Baldwin v. Blue Cross/Blue Shield*, 480 F.3d 1287, 1301 (11th Cir. 2007) (quoting *Oncale v. Sundowner Offshore Servs., Inc.* 523 U.S. 75, 80 (1998)). Although, from Plaintiff's viewpoint, Thompson's interactions with her were not appropriate, they were not race discrimination.

Even if Plaintiff had been able to establish a prima facie case of race discrimination, she would not be able to demonstrate that Defendant's stated reasons for terminating her employment – poor performance – were pretextual. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir. 1996). Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions … [their] inquiry is limited to whether the employer gave an honest explanation of its behavior." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir.2000) (quoting *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991) (internal citations omitted)).

Thomas Wallace, who was the ultimate decision-maker regarding her termination, stated that his decision to terminate Plaintiff's employment was made without regard to her race or her exercise of her rights under FMLA. Doc. 49-3, ¶ 4. His decision was based solely on Plaintiff's job performance. *Id.* The evaluation of Plaintiff's job performance was provided to Wallace by Thompson. Thompson appears to have very carefully documented the deficiencies in Plaintiff's work, and asserts that neither his "supervision of her [n]or personal interactions with her were driven in any way by her race." Doc. 49-1, ¶ 12. He also asserts that his decision to recommend Plaintiff's termination was based solely on what he considered her poor performance and attitude. *Id.* at ¶10. Melton also asserts that the reason for Plaintiff's termination was poor performance. Doc. 49-2, ¶ 24. Finally, the fact that David O'Keefe, the manager of finance and accounting for the Florida Prepaid College Board, communicated with Plaintiff on a daily basis and never found her to be insubordinate in no way establishes that Plaintiff was discriminated against by Thompson because of her race. Doc. 59-24, pg. 4 & 8. Only Plaintiff's own suspicions suggest otherwise, and these allegations are insufficient to withstand a motion for summary judgment.

*Count II: Retaliation*

Plaintiff alleges that she voiced opposition to unlawful employment practices and was the victim of retaliation thereafter. Complaint, ¶ 26. Although the complaint seems to refer only to Plaintiff's reporting of unlawful employment practices (presumably the January 8, 2011, e-mail) and being retaliated against for that action, during discovery the focus seems to have shifted; now Plaintiff's position is that her employment was terminated not only in retaliation for voicing opposition to racial discrimination, but also for taking FMLA leave.

Thompson made the recommendation for Plaintiff to be fired on December 16, 2011, several weeks before she made her first allegation of racial discrimination on January 8, 2011. Further, the expiration of Plaintiff's 60-day performance improvement plan was five days before she sent the e-mail in which she claimed racial discrimination for the first time. Thus, there is no credible evidence that Plaintiff's firing was retaliation for opposing unlawful employment practices.

The only remaining opportunity for Plaintiff to succeed on her retaliation claim is to demonstrate that her employment was terminated because she requested and took FMLA leave. Plaintiff acknowledges that she knows of no action by Defendant which in any way affected her ability to take FMLA leave from December 20, 2010 through January 10, 2011, but alleges that Defendant

interfered with this leave by terminating her employment on the day she returned to work. Doc. 49-5, pg. 9-10 & 21.[13] She believes that she was terminated because she took FMLA leave from December 20, 2010 through January 14, 2011 because that was the first time she had taken FMLA leave and was terminated upon her return, and also because other employees took FMLA leave and were not terminated. *Id.* at 24-25. Plaintiff had no pending leave requests when she was terminated. *Id.* at 24. Given that the recommendation to terminate Plaintiff's employment was made before her FMLA leave began and before Thompson even knew about the leave request, there is no credible evidence that Plaintiff was retaliated against for exercising her right to take the leave. *See* doc. 49-1, ¶ 8. Accordingly, Defendant is entitled to summary judgment on Count II.

## IV. CONCLUSION

Summary judgment is granted for Defendant against Plaintiff on both Count I and Count II of the complaint. The Clerk is directed to close the case.

**ORDERED** on September 20, 2012.

> /s/ Richard Smoak
> **RICHARD SMOAK**
> **UNITED STATES DISTRICT JUDGE**

---

[13] Excerpts of Plaintiff's June 26, 2012 deposition are also contained in doc. 59-22.